Raymond J. HAVELICK, Plaintiff,

v.

JULIUS WILE SONS & CO., INC., Richard L. Blum and Howard L. Blum, Defendants.

No. 76 Civ. 1537.

United States District Court, S. D. New York.

Feb. 14, 1978.

Franklin J. Havelick, New York City, for plaintiff.

Peter P. Kenny, Peter Jason, Lipkowitz & Plaut, New York City, for defendants.

PIERCE, District Judge.

## OPINION and ORDER

At the close of plaintiff's case in this non-jury action, defendants have moved to dismiss on the ground that the plaintiff has shown no right to relief, pursuant to Rule 41(b) Fed.R.Civ.P. The Court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) Fed.R.Civ.P.

### Findings of Fact

This action is brought by plaintiff Raymond J. Havelick, pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq. ("the Age Act"). Plaintiff claims that the termination of his employment with the defendant Julius Wile Sons & Co. ("JWS") was part of an unlawful scheme by JWS and its parent corporation, Standard Brands, Inc., between 1972 and 1975 to replace older employees with younger men in order to reduce corporate expenditures relating to salaries and pension benefits.

Plaintiff joined JWS in 1946 as a clerk; the following year he was made a salesman. In 1965, Havelick was made responsible for JWS' mid-western sales territory, and in 1973, he was promoted to manager of the JWS Western Division. At the time of his termination in April, 1975, the plaintiff was a Vice-President and Western Division Sales Manager for JWS, with responsibility for thirteen states, including two very significant markets, Northern and Southern California. In each of the years 1970 through 1974, Havelick received salary raises and bonuses. However, defendants offered testimony showing that these raises and bonuses were primarily routine.

During the relevant period, defendant JWS was in the business of importing wines and spirits for sale in this country. JWS acted as agent for several foreign producers of wines and spirits, selling these products to distributors who in turn resold the products to retailers. Between 1973 and 1975, the period most crucial here, defendant Howard Blum was JWS' Senior Vice-President and General Sales Manager and defendant Richard Blum was JWS' President and Chairman of the Board of Directors.

Plaintiff's responsibilities as Manager of the Western Division included the supervision of JWS District Sales Managers, and the sale and distribution of JWS products in the western portion of the United States. Plaintiff's direct superior was Howard Blum.

While the plaintiff has presented certain evidence concerning his sales performance, the facts most important to the Court's decision are those relating to the relationship between Havelick and his superiors. Between May 1973 and April 1975 there transpired a series of incidents which must be considered as having a significant bearing on JWS' ultimate decision to discharge the plaintiff.

In May 1973, Howard Blum wrote to the plaintiff, directing him to take a specific list of wine samples to a Mr. Stark of Safeway Stores in an effort to promote JWS' longtime interest in having Safeway carry JWS wines in their supermarkets. Although Blum had asked plaintiff in May to take forty-eight samples to Safeway, Havelick did not deliver any samples to Safeway until September 21, 1973. At that time, Havelick delivered only five wine samples, two of which he later agreed with Blum were "unwise" selections. The correspondence relating to this incident evidences JWS' dissatisfaction with plaintiff's performance (see DX–N, DX–Q, DX–R, DX–S, DX–U). Howard Blum accused Havelick of "fumbling the ball" with Safeway. Plaintiff conceded on cross-examination that Blum's memos constituted a criticism of his work. However, plaintiff states that this criticism was unjustified in light of JWS' long history of unsuccessful efforts to promote such sales in Safeway supermarkets.

Plaintiff also conceded that Howard Blum had criticized him for failing to see that Safeway ordered sufficiently early to obtain special JWS Christmas giftboxes. Havelick further conceded that despite Blum's specific direction that he visit Stark regularly in an effort to cultivate his interest, Havelick called to see Stark only four to six times in 1973. Further, plaintiff conceded that he was criticized by Blum for his failure to follow up on a plan to show Stark the success of JWS' supermarket wine program in Southern California (DX–W).

Howard Blum was also critical of Havelick's continual failure to file written progress reports with the New York office, and his similar failure to insure that his subordinates filed such reports. As a JWS policy statement (DX–J–4) reveals, Howard Blum had directed all salesmen to file regular reports so that the corporate officers in New York could have some understanding of what was happening in the field. Despite this clear JWS policy, Havelick found himself criticized often by Blum for his failure to insure that his men filed reports (DX–X) and for his own failure to file reports (DX–BB). Indeed, the latter criticism was contained in a memorandum so filled with ire that any reasonable person would have concluded that his employment was in jeopardy. In that memo, dated October 4, 1974, Howard Blum wrote that he was "appalled to call to [plaintiff's] attention" the fact that JWS had received no written progress reports from Havelick since September 6, 1974. Havelick explained that his failure to file reports was due to the fact that in early July, 1974, he had to discharge his secretary for budgetary reasons. Havelick had made a request for a part-time secretary (PX–164); however, he never followed up on this request.

During 1974, several other incidents occurred which provoked Howard Blum to send Havelick memos containing sharp criticisms of the plaintiff's job performance. For example, in March, 1974, Howard Blum wrote to say that he was unable to understand why one of Havelick's subordinates could not obtain an accurate inventory count at one warehouse (see DX–C–2). Blum two months later criticized Havelick for giving his subordinates "vague directions" (DX–GG). In June, 1974, Havelick was criticized for giving retailers "unrealistic" arrival dates for JWS shipments (DX–JJ). Havelick was also sharply criticized by Blum in June, 1974, for his failure to post with the California state authorities

new prices for "Get Peppermint" in order to insure that the same prices were charged in northern and in southern California (see DX–KK, DX–LL, DX–MM, DX–NN, DX–OO).

An incident that further provoked Howard Blum to criticize Havelick was the plaintiff's failure to obtain an assistant for his subordinate Mr. Redin to aid Redin in JWS' successful southern California supermarket wine program. In March, 1974, Havelick was directed to hire a part-time assistant for Redin. Two months later, Blum reprimanded Havelick for his failure to obtain such an assistant, and authorized the hiring of a full-time assistant for Redin (DX–RR). It was not until October, 1974, that a full-time assistant was finally hired even though the position, according to Howard Blum, paid $12,000 per year and required relatively modest qualifications.

In March, 1974, Mr. Frank D'Alessandro, a Group Vice-President of JWS' parent, Standard Brands, visited Havelick in San Francisco to discuss, among other things, the California business and Havelick himself. The plaintiff stated that he did not consider this meeting to be part of an evaluation of his performance. The Court finds that it was. Based on this meeting, D'Alessandro recommended to Richard Blum that Havelick be terminated on grounds that he was not serious enough about his work and did not appear willing to devote the time and effort required to develop business. Richard Blum testified that in response to this criticism, the size of Havelick's territory was limited in the hope that he would improve his performance (DX–F–4). In July, 1974, the Central Division states were removed from his responsibilities and Hawaii was added.

Havelick also came under criticism for his handling of several matters relating to two JWS promotional campaigns to improve sales and distribution of a sherry known as Dry Sack. At the end of the "Venenciador" promotion drive which commenced on March 1, 1974, Blum wrote a caustic memo to Havelick noting that of the six distributors under Havelick's supervision which were selected to participate in the program, only one of the distributors satisfactorily completed the drive (DX–B–3).

In September, 1974, JWS launched a three-million dollar promotional campaign to increase the distribution of Dry Sack. In southern California, JWS' distributor, Youngs Market, had selected inappropriate figures upon which to judge its sales performance in this campaign. Howard Blum testified that Havelick had failed to convince Youngs Market to use an appropriate base year, and that Blum himself eventually had to intervene to correct the situation. In northern California, Havelick also had significant difficulties with JWS' distributor, Juillard Alpha Liquor Company ("JALCO"). JALCO refused to adopt many aspects of the Dry Sack campaign. JALCO reduced the target figures set by JWS: it failed to set individual sales quotas for its salesmen; it neglected to set point-of-sale quotas; it did not establish bonuses for sales above the quotas; and it did not post the discounts JWS had planned. Although the Dry Sack three-million dollar campaign began in September, 1974, Howard Blum testified that it was not until November, 1974, that he was informed by Havelick that JALCO was refusing to implement the program. While Blum conceded that there had always been problems with JALCO, he testified that the problems should not have been so significant in the Dry Sack campaign. By a memo dated March 3, 1975, at the end of the campaign, Howard Blum pointed out to Havelick that JALCO had increased its Dry Sack sales by only forty-nine per cent whereas JWS' top twelve markets across the United States had increased sales by 106% (DX–P–3).

In April, 1975, the difficulties between Havelick and JWS came to a head when Howard Blum and his new superior, Laurence Taylor, visited California to consider whether JWS should take the major step of switching the northern California distributorship from JALCO to Haas Brothers. On April 2, 1975, following a meeting with the Haas management, Havelick, Howard Blum, and Laurence Taylor met to discuss

924

the proposed change. It is clear from the evidence that Havelick was opposed to the switch, and Havelick so informed his superiors, stating that he thought he was finally building up a rapport with JALCO and further that Haas' sales staff was too small compared to JALCO's. Taylor then called Richard L. Blum in New York who made the decision to go ahead with Haas. When informed of this, Havelick stated that since the decision had been made, he would go along with the change.

During this visit to California by Blum and Taylor, three rather minor incidents occurred which, in the Court's view, merit limited discussion. Soon after meeting Havelick, Taylor questioned him regarding parts of his territory outside of northern California. Havelick, according to Richard Blum to whom Taylor reported, was unable to give knowledgeable answers. After the Haas meeting, Blum discovered that he had left his briefcase at the Haas' offices and asked Havelick to retrieve it. Havelick answered, "Do I have to?" before leaving to fulfill the request. Later that evening Havelick did not stay to have dinner with Taylor and Blum, but excused himself on the ground that he had another long-standing engagement to keep. Richard Blum testified that this behavior was strange since there were many details regarding the change in distributors that the three men might have discussed and since it would have been courteous to have dinner with one's superiors upon such a visit.

While two of these incidents constitute, at most, insubstantial breaches of corporate etiquette, the incidents nevertheless reveal on the part of Havelick a lack of certain qualities that might well be expected in upper-level managers. Although these incidents standing alone might not be sufficient cause for termination, the Court does not find it inconsistent that these incidents may well have been "the straw that broke the camel's back," and that Havelick had been given his final chance to improve (DX–D–4) and had failed. It is undisputed that upon the return of Howard Blum and his superior to the New York office, the decision was made to discharge Havelick.

As both Howard and Richard Blum testified, a principal reason for the discharge was Havelick's continued failure to improve his lackluster performance. The Court finds that the events of the California trip simply served to reinforce their dissatisfaction with Havelick's performance. The JWS management also was apprehensive about whether Havelick could be expected to do an adequate job with its new distributor, since Havelick had opposed the switch from JALCO to Haas.

On April 11, 1975, Howard Blum returned to San Francisco to inform Havelick that JWS was requesting that he take early retirement effective June 1, 1975. Havelick was asked to turn over his files, and following April 11, 1975, he rendered no further services to JWS. At the time, Raymond Havelick was fifty-six years of age. While defendants maintain that Havelick took early retirement voluntarily under the JWS pension plan, it is clear to this Court that Havelick was discharged. In June 1975, JWS paid to plaintiff $15,096.04 in severance pay and a lump-sum pension payment in the amount of $93,620.95.

On October 6, 1975, plaintiff filed a complaint with the California Fair Employment Practice Commission ("FEPC"). On November 4, 1975, a Commissioner wrote to the plaintiff to inform him of the Commission's intention to order the case closed at its December 4, 1975 meeting since plaintiff had elected court action. On December 10, 1975, the FEPC wrote, to JWS only, to state that the case had indeed been closed on December 4, 1975. Plaintiff did not receive notice of the final action regarding closure until January 13, 1976, when his attorney made inquiry of the FEPC. On January 15, 1976, plaintiff gave notice of his intention to sue in federal court to the United States Secretary of Labor. This action was commenced in April, 1976.

Before considering the applicable law, it is appropriate to discuss plaintiff's evidence relating to his claim that a pattern and practice of age discrimination existed at JWS. Plaintiff alleges that between 1972

and 1975, the vast majority of JWS' senior officers and executives were either discharged or took early retirement. Several of the persons terminated seem to have been discharged for cause, such as Adrian D'Hanis, Joseph Harris, and Thomas Peirona. Even Havelick, on cross-examination, acknowledged that some of the criticism leveled at these employees was justified. Similarly, Havelick testified that some executives, such as Julius Wile and Robert Reade, retired voluntarily. Others, such as Paul Berti and John Mera, appear to have been discharged for a combination of reasons including the elimination of their job positions. One JWS employee whom plaintiff claims was a victim of the practice, Howard Blum, is also claimed to have been a chief architect of the discriminatory plan. As the discussion within indicates, the mere fact that senior men are often replaced by younger men does not in itself establish a pattern and practice of age discrimination. Pattern and practice allegations may not be used as a shield to protect employees who are not performing satisfactorily from being discharged. Indeed, the question of whether or not such a pattern existed here is of minor importance in light of the overwhelming evidence that Raymond Havelick was discharged for cause.

### Conclusions of Law

This Court has jurisdiction over this action pursuant to 29 U.S.C. § 626(c) (1975). The Court as the trier of fact in a non-jury action is not required to give any special preference to plaintiff's evidence on the motion to dismiss at the close of plaintiff's case. Rather, the Court on a Rule 41(b) motion shall make an unbiased consideration of all the evidence, direct and circumstantial, and accord the evidence such weight as the Court believes the evidence deserves. See 5 Moore's Federal Practice ¶ 41.13(4) at 1158–59 (2d Ed. 1969). The Court has applied this standard in making the foregoing findings of fact. For the reasons that follow, the Court concludes that "upon the facts and the law the plaintiff has shown no right to relief." See Rule 41(b) Fed.R.Civ.P.

As is clear from the evidence, the principal issue here is whether or not the plaintiff was discharged for good cause. However, before reaching this question, the Court rules as follows on two subsidiary issues.

First, it is the Court's judgment that this action was timely filed and that plaintiff gave timely notice of his intention to sue as required by 29 U.S.C. § 626(d)(2) (1975). The Court concludes that plaintiff did not have actual notice of the termination of his state administrative action until January 13, 1976. His filing with the Secretary of Labor on January 15, 1976 was within thirty days "after receipt by the individual of notice of termination" and thus was timely. 29 U.S.C. § 626(d)(2) (1975).

Defendants' contention that the plaintiff voluntarily retired is not supported by the evidence. It is abundantly clear that plaintiff's services were terminated. Where there is evidence of a clear intent on the part of the employer to dispense with the employee's services, and where that intent is the equivalent of a declaration that the services of the employee will no longer be accepted, discharge is established. See *Monroe v. Penn-Dixie Cement Corp.*, 335 F.Supp. 231 (C.D.Ga.1971). It is apparent that plaintiff's termination had nothing to do with the JWS retirement plan, except for the fact that plaintiff was allowed to "retire" under that plan so that he might receive his vested pension rights. As plaintiff's counsel notes, were defendants' argument accepted on this point, all persons under sixty-five who were entitled to pension benefits could be terminated because of their age and foreclosed from an age discrimination claim if they elected to receive their pension benefits. This would truly constitute use of a pension plan as a "subterfuge to evade the purposes" of the Age Act. 29 U.S.C. § 623(f)(2) (1975). Thus, the defense of voluntary retirement is rejected. The Court also rejects defendants' contention that principles of equitable estoppel foreclose plaintiff's lawsuit here.

Section 623(f) provides as follows:

"It shall not be unlawful for an employer . . . (3) to discharge or otherwise

discipline an individual for good cause." (29 U.S.C. § 623(f)(3) ).

Plaintiff argues that defendants may not avail themselves of this defense since they never made any "objective" evaluation of the plaintiff's job performance. Plaintiff has further offered evidence to show that Havelick's sales performance was as good or better than that of his peers at JWS. However, that is not the standard which must be applied. While the Court must consider all of the evidence in assessing the reasons cited by the employer for its decision to discharge, the Court is not ultimately concerned with whether or not those reasons were objectively true or false. *Hays v. Republic Steel*, 12 FEP Cas. 1640 (N.D.Ala.1974), *aff'd*, 531 F.2d 1307 (5th Cir. 1976). Rather, in order to rebut the defendants' "good cause" defense, the plaintiff must establish that there was no reasonable or rational basis for the employer's decision. *Bishop v. Jelleff Associates*, 398 F.Supp. 579, 593 (D.D.C.1974). Plaintiff must therefore demonstrate that the decision was not made in the exercise of good faith business judgment. *Id.* See *Surrisi v. Conwed Corp.*, 10 FEP Cas. 706 (D.Minn.1974), *aff'd*, 510 F.2d 1088 (8th Cir. 1975). When a defendant employer offers evidence that a plaintiff employee was discharged for cause, the plaintiff has the burden of establishing that "the reason advanced by the defendant, i. e., poor work performance, was merely a pretext for a course of conduct prohibited by the Act." *Taylor v. Safeway Stores, Inc.*, 365 F.Supp. 468 (D.Colo.1973), *modified on other grounds*, 529 F.2d 263 (10th Cir. 1975). Only where the "cause" was unlawful may the Court substitute its judgment for that of management. *Brennan v. Reynolds & Co.*, 367 F.Supp. 440 (N.D.Ill.1973).

In the course of cross-examination on plaintiff's direct case, the defendants have offered cogent evidence to support their claim that plaintiff's job performance was unsatisfactory. In its findings of fact set forth above, the Court has listed at least twelve separate incidents between early 1973 and April 1975 in which plaintiff's job performance was sharply criticized by his direct superior, Howard Blum. Three of his superiors, Howard Blum, Laurence Taylor and Frank D'Alessandro, each separately recommended Havelick's termination, and a fourth, Richard Blum, had also expressed dissatisfaction with Havelick's job performance. The Court has heard the testimony of Howard Blum, Richard Blum, and of the plaintiff Raymond Havelick. Weighing the respective credibility of these witnesses and assessing the exhibits received in evidence, the Court is compelled to conclude that the decision to discharge the plaintiff was made upon a rational and reasonable basis and in good faith. Plaintiff's failures with respect to Safeway Stores, his inattention to the hiring of an assistant for Mr. Redin, his inattention to the Venenciador campaign and the major Dry Sack promotional campaign, his failures in dealing with JALCO, and his continued failure to file written reports with JWS all created a situation where the JWS corporate officers no longer had faith in his ability to perform his role as a Division Sales Manager. In April, 1975, when plaintiff opposed the change of distributors from JALCO to Haas Brothers, the defendants determined that Havelick was not the right person to handle the important change-over to a new distributor. This was a business judgment. Plaintiff has failed to carry his burden of proving that this decision borne of the events of recent years described hereinabove was made in bad faith and without a rational basis. As one court has stated, the Age Act does not constitute a vehicle for federal judicial review of the bona fide decisions of corporate management.

> "Whether an executive in conflict with management is an able businessman [is] not the kind of judgment the courts are permitted or required to make under the Act. Thus, the Court holds that the statute is not violated in the case of terminations or other employer decisions which are premised upon a rational business decision made in good faith and not actuated by age bias. To conclude otherwise would make the federal courts a super board of directors reviewing bona fide

management decisions, a procedure Congress clearly did not intend by passage of this Act." (*Bishop v. Jelleff Associates, supra*, 398 F.Supp. at 593.)

It is clear that an employee may be discharged for good cause at any time, absent discrimination. *Houghton v. McDonnell Douglas Corp.*, 413 F.Supp. 1230, 1240 (E.D.Mo.1976). In order to establish an age discrimination claim, the plaintiff must show some fact demonstrating that his discharge was due to his age; conclusory allegations are insufficient. *deLoraine v. MEBA Pension Trust*, 499 F.2d 49, 51 (2d Cir. 1974). Simply because other senior employees of JWS were, like the plaintiff, replaced by younger employees, does not establish that a pattern or practice of age discrimination is presented. See *Laugesen v. Anaconda Co.*, 510 F.2d 307 (6th Cir. 1975).

Accordingly, the Court concludes that plaintiff has failed to carry his burden of proving that the reasons advanced by the defendants for the discharge were merely a pretext for a course of conduct violative of the Age Act. Rather, the record on plaintiff's own case makes abundantly clear that the decision of the defendants was made in good faith and constituted a reasonable exercise of business judgment. Once the "good cause" defense has been demonstrated, the statutory condition precedent has been established and the employer's action is valid. *Brennan v. Reynolds & Co., supra*, 367 F.Supp. at 444.

Since plaintiff has failed to establish that he was the subject of age discrimination, and since it is apparent that plaintiff has no right to relief, the defendants' motion pursuant to Rule 41(b) Fed.R.Civ.P. must be, and hereby is, granted. Counsel for defendants is directed to submit an appropriate order of judgment dismissing the complaint with prejudice, on five days' notice. The Court directs that costs are to be awarded to neither party.

SO ORDERED.