Andrew P. HEBERT,
Plaintiff, Appellant,

v.

The MOHAWK RUBBER COMPANY,
Defendant, Appellee.

No. 88–1743.

United States Court of Appeals,
First Circuit.

Heard Jan. 11, 1989.

Decided April 24, 1989.

Stuart DeBard with whom Weston, Patrick, Willard & Redding, Boston, Mass., was on brief for plaintiff, appellant.

Keith L. Pryatel, South Russell, Ohio, with whom John E. Holcomb, Akron, Ohio, Millisor & Nobil, Richard P. Ward and Ropes & Gray, Boston, Mass., were on brief for defendant, appellee.

Before COFFIN and BREYER, Circuit Judges, and PETTINE,* Senior District Judge.

PETTINE, Senior District Judge.

Plaintiff-appellant, Andrew P. Hebert, appeals from a grant of summary judgment to defendant-appellee, The Mohawk Rubber Company ("Mohawk"), in an age discrimination action brought under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. sec. 621 *et. seq.* In finding for the defendant and against plaintiff on his cross-motion for summary judgment, the United States District Court for the District of Massachusetts determined not only that Hebert had failed to establish a *prima facie* case of age discrimination because he voluntarily retired, but also that Hebert had failed to demonstrate that the non-discriminatory reasons articulated by defendant for its decision to approach Hebert with an offer of early retirement, among them a company-wide reorganization designed to reverse the company's slide into unprofitability, were pretexts for age discrimination. On the surface, then, this case has a familiar ring to it: this

* Of the District of Rhode Island, sitting by designation.

Court has seen before senior executives who, faced with a general reduction in force, voluntarily elect early retirement, only to come, with the passage of time, to view their election as a choice forced upon them by an employer determined to rid itself of its older employees. *See, e.g., Schuler v. Polaroid Corp.*, 848 F.2d 276 (1st Cir.1988); *Holt v. Gamewell Corp.*, 797 F.2d 36 (1st Cir.1986). In this particular case, however, our review of the proffered evidence and relevant case law leads us to conclude that: (1) Hebert was indeed the victim of a "forced choice" retirement and (2) Hebert has cast sufficient doubt on the company's alleged non-discriminatory reasons for forcing his retirement to raise a genuine issue as to Mohawk's discriminatory intent. Accordingly, we reverse.

## STANDARD OF REVIEW

This Court has recently rehearsed the standard to be applied when reviewing the correctness of a grant of summary judgment:

> The root issue in any summary judgment review is whether the provisions of Federal Rule of Civil Procedure 56(c) have been met: Do "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law"? ... To demonstrate that no genuine issue of material fact exists, the moving party must point out "an absence of evidence supporting the nonmoving party's case." *Celotex Corp. v. Catrett*, [477 U.S. 317], 106 S.Ct. 2548, 2554, [91 L.Ed.2d 265] (1986). In reviewing the trial court's grant of summary judgment, we must view the record in the light most favorable to the party opposing the motion, and must indulge all inferences favorable to that party. The party opposing the motion, however, may not rest upon mere allegations; it must set forth specific facts demonstrating that there is a genuine issue for trial.

*Oliver v. Digital Equipment Corp.*, 846 F.2d 103, 105 (1st Cir.1988) (citing *Metropolitan Life Insurance Co. v. Ditmore*, 729 F.2d 1, 4 (1st Cir.1984); *King v. Williams Industries, Inc.*, 724 F.2d 240, 241 (1st Cir.1984), *cert. denied*, 466 U.S. 980, 104 S.Ct. 2363, 80 L.Ed.2d 835 (1986); *Daury v. Smith*, 842 F.2d 9, 11 (1st Cir. 1988)). *See also, Menard v. First Security Services Corp.*, 848 F.2d 281, 284–85 (1st Cir.1988) (applying standard enunciated in *Oliver* to age discrimination case brought under the ADEA).

Additionally, we have even more recently explained that, in determining whether a case is so one-sided that one party must prevail as a matter of law, this Court is to consider "not whether there is literally *no* evidence favoring the non-movant, but whether there is any upon which a jury could properly proceed to find a verdict in that party's favor." *De Arteaga v. Pall Ultrafine Filtration Corp.*, 862 F.2d 940, 941 (1st Cir.1988). *See also, Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 249–52, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Perez de la Cruz v. Crowley Towing & Transp. Co.*, 807 F.2d 1084, 1086 (1st Cir. 1986), *cert. denied*, 481 U.S. 1050, 107 S.Ct. 2182, 95 L.Ed.2d 838 (1987).

Accordingly, we undertake to review the District Court's grant of summary judgment by viewing the record in the light most favorable to Hebert and indulging all inferences favorable to him.

## THE FACTS

The record in this case reveals that some of the central facts are essentially undisputed. In January 1969, at the age of forty-three, Hebert was hired from a field of fifty applicants to serve as the controller of Beebe Rubber Company ("Beebe"), a subsidiary of Mohawk purchased in December 1968. As controller, Hebert was responsible for all accounting and processing of financial data, including the preparation of financial statements, budgets and reports concerning taxes, insurance and pensions. In his capacity as chief accounting officer of the company, Hebert oversaw a staff of ten to thirteen people and was

eventually appointed a vice president of the division of Mohawk of which Beebe was a part. By 1984, the year he left the company, Hebert was earning an annual salary of $42,000, exclusive of bonuses.

From the time of its purchase by Mohawk until the late 1970s, Beebe was remarkably profitable, posting annual increases in profits as a percentage of net sales from 1969 through 1978. After that period, however, and correlating with a series of changes in the company's leadership, Beebe's profits began to decline and by 1982 had plunged below the break-even point. Finally, in October 1983, Mohawk sent two people, Teri Lynch and Jody Feldman, from its home accounting department in Akron, Ohio, to try to pinpoint Beebe's problems. In a detailed report of their inspection, Lynch and Feldman identified "variances"[1] in material and labor costs as a major cause of Beebe's eroding profitability and specifically noted that the Beebe accounting department, under Hebert, could do more to address this problem:

ACCOUNTING PERSONNEL

RECOMMENDATIONS

(I). Currently there is a lack of direction in this area. Financial reports are generated but cause no action. The cost accountant should be working through the controller and together they should be working closely with production management. In addition to providing reports on labor variances (which are generated from known management decisions), they should also be concentrating on material variances and should act as the production department's major help in defining these variances. Instead of waiting for a computer to solve the problem, a manual system should have been in place two years ago.

Report of October 10, 1983 visit by T. Lynch and J. Feldman to Beebe Rubber Company, p. 4.

Early in 1984, Mohawk tried a new tack in its effort to stem the tide of red ink at Beebe, structuring a new division, the Industrial Products Group ("IPG"), out of three Mohawk subsidiaries, Beebe among them, and naming the successful manager of one of the three, Thomas Dalton of Fayette Tubular Products Company, to head up the division. Among his first acts at the helm of IPG, Dalton convened a meeting with Edward McAdam, then President of Beebe Rubber, and informed McAdam that he was to be removed from his position in the company, citing McAdam's inability to turn Beebe around.[2] The notes of this meeting further establish that McAdam's firing was but the first step in a planned reduction in force at the company, reciting that:

Dalton explained that he intended to make a substantial re-organization and consolidation of personnel and Beebe operations to put the company back on its feet as soon as possible and move forward with a strong, profitable and healthy Beebe Rubber Company. Dalton explained that the options were essentially to restore Beebe to health or to close Beebe. Tom explained that he would be evaluating within the next 24–48 hours the strongest people from within the organization to carry on operations in the near term.

Indeed from the beginning of Dalton's tenure as the head of IPG in April 1984 until Hebert was approached about taking early retirement in late October 1984, twenty-three employees were in fact terminated from Beebe, either through resignation, discharge, retirement, job elimination or

---

1. A variance is defined by the defendant as the difference between the amount of raw materials and labor theoretically needed to manufacture a particular part/product and the amount of materials and labor actually used to produce the part/product. D. Brief on Appeal 3 n. 2.

2. Since McAdam was sixty-two years old at the time of his discharge, Dalton offered him the option of early retirement in order to allow him

"to depart without embarassment and on mutually acceptable terms." Notes dictated following April 24, 1984 meeting between T. Dalton, E. McAdam and J. Kitchin. Although McAdam accepted the offer, both parties to this action agree that McAdam was forcibly separated, not voluntarily retired, from the company, but for reasons having to do with "inadequacy as opposed to age." Hebert Depo. 106.

layoff. Of this group, seventeen employees were under forty years of age and six were aged forty and above. D. Brief on Appeal 25. Further, by January 1985, the number of Beebe employees terminated under Dalton's leadership had swelled to thirty-eight, twenty-two under forty and sixteen in the protected class,[3] Andrew Hebert among them.[4]

The chronology of Hebert's departure from the company is also undisputed. Beginning sometime in August 1984 and continuing through October 1984, Dalton and Arlie Reeves, one of three managers assigned to take over McAdam's responsibilities at Beebe, began to discuss relieving Hebert of his position with the firm. Finally, on October 15, 1984, Dalton wrote to Reeves spelling out the terms of an early retirement package for Hebert that would be acceptable to Dalton. This memorandum prompted in turn an October 23, 1984 meeting between Hebert and Reeves, in which Reeves revealed to Hebert for the first time the company's desire that he take early retirement. Although "extremely shocked" by Beebe's offer of retirement, Hebert drafted, on October 25, 1984, a counter-proposal spelling out an early retirement package that would be acceptable to him. One month later, on November 21, 1984, Hebert's counter-proposal was accepted by Dalton with only a change in the timing. As agreed, Hebert retired on December 31, 1984, at the age of fifty-nine, with three months severance pay, a pension of $570 per month, lifetime health insurance coverage for him and his wife, and a temporary consulting position to assist in Beebe's year-end financial work. Since Hebert's retirement, Beebe has complied with the terms of this agreement.

At this point in our narrative, the remaining facts and the inferences to be drawn from them are the subject of considerable debate. Hebert contends, in essence, that, despite the upheavals at Beebe, he was performing his duties well and could not reasonably have been targeted for dismissal as part of a reduction in force designed to weed out the weaker members of the organization. In support of his contention, he has adduced evidence of an exemplary sixteen year work history at the firm, complete with commendations, promotions and bonuses, an investment of considerable overtime producing needed financial data, and a record of contributions to the company-wide effort to reverse Beebe's worsening profit picture, including an accounting adjustment that enabled the firm to write-off $100,000 of uncollectible receivables and the design and implementation of a computerized tracking system which enabled the company to monitor closely the very production variances that had long been identified as a major cause of Beebe's decline. Hebert further supports his position that he was a competent and diligent employee by citing the deposition testimony of each of the major players in the Beebe drama, to the effect that he was viewed by Beebe's top management as a qualified, albeit overly detail-oriented, controller whose place in the company was secure. *See, e.g.,* McAdam Depo. 158–59; Reeves Depo. 40, 45. Even Dalton, Hebert points out, admitted in deposition that he had never criticized Hebert for failing to send him requested financial data, nor had he ever been made aware of errors or omissions in Hebert's work. Dalton Depo. 11, 29. Additionally, Dalton's admissions were corroborated by Reeves, who stated that Dalton had never commented to Reeves that the reports he was receiving from Hebert were not what he needed to assert control of the Beebe operation. Reeves Depo. 46. Reeves also made it clear that the variances problems at Beebe were the responsibility of all of management, most specifically

---

**3.** 29 U.S.C. sec. 631 defines the protected class as "individuals who are at least 40 years of age but less than 70 years of age."

**4.** The Beebe Rubber History of Terminations 1/84–1/85 lists forty-four individuals. Of these, five employees were separated from the company under McAdam, four persons under age forty and one in the protected class. D. Brief on Appeal 6 n. 4. A sixth individual, also under age forty, was simply transferred from hourly to salary compensation. Viewed as a whole, the record sketches a picture of a company in the throes of an on-going reorganization, pre-dating Dalton and calculated to restore Beebe to profitability. *See, e.g.,* Hebert Depo. 30.

of the plant manager, materials manager and quality assurance manager. Reeves Depo. 8–9. Finally, Jody Feldman, the co-signer of the October 1983 memorandum that first identified variances in material and labor costs as a key problem at Beebe, testified that "basically there were good financial controls at Beebe Rubber" and that the general thrust of his recommendations was to call for the institution of "more control within the plant itself and more documentation." Feldman Depo. 65.

Against this backdrop of competent job performance, Hebert further argues that his "retirement" from Beebe was in fact a discharge and that the reason for his discharge was age discrimination. He rests the former contention on several items of evidence, among them confidential discussions between Dalton and Reeves regarding terminating Hebert (Dalton Depo. 33; Reeves Depo. 31); Reeves's admission that when he approached Hebert with the "request" that he take early retirement Hebert was in fact given no choice but to retire (Reeves Depo. 36); a statement by Terry Hill, Treasurer of Mohawk, characterizing Hebert's departure from Beebe as a firing (Hill Depo. 59); and his own letter of October 25, 1984, in which he clearly articulated that he interpreted the "request" that he take early retirement as an involuntary termination. As to the latter claim, Hebert submits both that he was replaced as controller by Jody Feldman, the twenty-eight year old Mohawk accountant originally sent to investigate Beebe's declining profitability, and that his was not an isolated case, the company having terminated thirteen [5] of the seventeen employees over forty-nine years of age during Dalton's rise to power in 1984, while not hiring anyone in this age group during the same period of time.

Mohawk, for its part, vigorously dissents from Hebert's version of the facts. First, the company articulates and documents two non-discriminatory reasons for the decision to approach Hebert with a request that he take early retirement,[6] Dalton's displeasure with what he perceived as Hebert's unnecessarily detailed financial reports and with the absence of analysis in those reports pinpointing strategies for improving Beebe's efficiency (Dalton Depo. 49, 52; Reeves Depo. 31; Hebert Depo. 62, 68), and a personality clash between Dalton and Hebert (Hebert Depo. 64). Additionally, defendant staunchly maintains that, once the problems with Hebert's job performance surfaced, top management caucused over a period of two months in an effort to generate an acceptable early retirement incentive program for Hebert, much as it had done with McAdam a few months before, and that Hebert, after some negotiation over the terms of the package, voluntarily retired. Letter of October 15, 1984 from T. Dalton to A. Reeves (exploring "what benefits might be available to ... Hebert were he to option to an early retirement"); Dalton Depo. 44; Reeves Depo. 30–6. Further, although agreeing that Jody Feldman was hired as assistant controller with the expectation that he would one day replace Hebert, the company relies on Feldman's August 6, 1984 letter accepting Beebe's offer of employment to support its position that Feldman was being groomed to replace Hebert at some indeterminate future date when Hebert decided to step down, and not a moment before. Finally, defendant attempts to refute Hebert's statistical evidence of age animus at Mohawk by arguing that, as a matter of law, the Beebe Rubber History of Terminations 1/84–1/85 fails to support an inference of age discrimination in the absence of additional evidence regarding,

---

**5.** Plaintiff variously speaks of thirteen or fourteen of seventeen employees over age forty-nine being terminated during the relevant time period. P. Brief on Appeal 2, 30–1. We, on the other hand, count sixteen employees in the protected class being terminated between April 1984 and January 1985 (*see* n. 3 *supra*). For purposes of this discussion, we adopt the more conservative of plaintiff's figures and still find plaintiff's evidence adequate to survive a motion for summary judgment.

**6.** The gist of defendant's rebuttal appears to be that top management did not fire Hebert, even though it had cause to do so, but that if Hebert had been fired the reasons justifying his termination would have been non-discriminatory.

for example, whether or not these older workers voluntarily or involuntarily left the company, or whether or not replacements were hired for terminated older workers and the ages of such replacements if they exist. In short, defendant argues, statistical evidence that older workers were leaving the company, without more, does not support a finding of age discrimination, especially in the context of an on-going reduction in force.

Whatever the truth of these cross-allegations, Hebert brought this ADEA action against Mohawk on October 20, 1986. On February 2, 1988, Mohawk moved for summary judgment and Hebert filed a cross-motion. On May 31, 1988, the District Court granted summary judgment to Mohawk and plaintiff therefrom appeals.

## APPLICABLE LAW

 The central issue in an action brought under the ADEA is "whether or not plaintiff was discharged 'because of his age'," that is that plaintiff's age "was the 'determining factor' in his discharge in the sense that, 'but for' his employer's motive to discriminate against him because of age, he would not have been discharged." *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1017, 1019 (1st Cir.1979). *See also, e.g., Menard*, 848 F.2d at 285. In order to prove a claim of age discrimination, an ADEA plaintiff must first establish a *prima facie* case of dis-crimination, thereby creating a rebuttable presumption that the civil rights violation complained of did indeed occur. In order to make out this *prima facie* case,[7] a plaintiff must demonstrate by a preponderance of the evidence that:

1. he was within the protected age group, that is 40–70 years of age;[8]

2. he was fired (actually or constructively);[9]

3. he was qualified for the job that he was fired from, in the sense that he was doing his job well enough to rule out the possibility that he was fired for inadequate job performance, absolute or relative; and

4. he was replaced by someone with qualifications similar to his own, thus demonstrating a continued need for the same services and skills.[10]

*Loeb*, 600 F.2d at 1013. Further, in the context of cases involving reduction in force, this Court has glossed the elements of the *Loeb prima facie* case to enable a plaintiff to show either that he was purposefully or intentionally discriminated against as an individual (in keeping with the *Loeb* formulation) or that his employer's facially neutral actions had a significant discriminatory impact on members of the protected class. Thus, in order to establish a *prima facie* case of age discriminatory treatment in a case involving reduc-

---

7. In *Loeb*, we said that the formulation for a *prima facie* case of discrimination that we rely on here is not an inflexible formula to be rigidly applied in all ADEA cases. If, for example, a plaintiff is able to present direct evidence of discrimination or circumstantial evidence other than that outlined in the *Loeb* formulation that nevertheless supports an inference of discrimination, then he is entitled to his day in court. In this case, however, plaintiff's case follows the classic formula and will be evaluated against this standard.

8. In fact when *Loeb* was written, the ADEA defined the protected class as individuals "forty years of age but less than sixty-five years of age." Effective as of January 1, 1979, however, the scope of the protected class was revised upward to "less than 70 years of age" for private sector employers. This case falls squarely under the amended statute.

9. Relying on the basic rules governing constructive discharge in this Circuit laid down in *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1st Cir.1977), we articulated in *Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559 (1st Cir.1986) what a plaintiff must show to establish constructive discharge in an action brought under the ADEA, thereby clarifying the scope of the second element of the *Loeb* test, i.e. that the plaintiff was "fired."

10. Although recent First Circuit cases (*see, e.g., Menard*, 848 F.2d at 285; *Dea v. Look*, 810 F.2d 12, 14 n. 1 (1987)) have glossed this element of the *prima facie* case as replacement by a younger person or person outside the protected age group, we have recently explained that this formulation misreads *Loeb* and that in this Circuit an ADEA plaintiff need not go so far as to show that he was thus replaced to make out his *prima facie* case. *Freeman v. Package Machinery Co.*, 865 F.2d 1331, 1335 (1st Cir.1988).

tion in force, a plaintiff may, in the alternative, show that:

1. he was within the protected age group, that is 40–70 years of age;
2. he was fired (actually or constructively);
3. he was performing his job at a level that met his employer's legitimate expectation; and
4. the employer did not treat age neutrally or that younger persons were retained in the same position.

*Holt*, 797 F.2d at 37–8. *See also Schuler*, 848 F.2d at 278. Finally, in cases involving an employer's offer of an early retirement incentive plan to employees in the protected class, this Circuit has adopted the majority view that an ADEA plaintiff cannot establish his *prima facie* case merely by showing that such an offer was made or that its attractive terms induced plaintiff's retirement. *Schuler*, 848 F.2d at 278 (explicitly adopting rationale and conclusions of *Henn v. National Geographic Soc'y*, 819 F.2d 824 (7th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 454, 98 L.Ed.2d 394 that an early retirement plan is a "carrot," not a stick, and thus cannot ordinarily violate the ADEA). *See also Gray v. New England Tel. and Telegraph Co.*, 792 F.2d 251, 255 (1st Cir.1986). Thus, an ADEA plaintiff claiming that he was, in effect, fired by being forced into retirement must show that his employer's "offer" was but an empty sham masking its decision to fire the plaintiff because of his age. *Henn*, 819 F.2d 824 (exploring proper role of the fact of a retirement under an early retirement plan in establishing ADEA plaintiff's *prima facie* case and articulating test for distinguishing early retirement from discharge).

Once an ADEA plaintiff has established his *prima facie* case, it is for the defendant to rebut the inference of age discrimination that has arisen by articulating legitimate, nondiscriminatory reasons for acting as it did. If the defendant succeeds with its rebuttal, the initial presumption of age discrimination is dissolved and plaintiff must respond by showing that the reasons presented by the defendant are merely pre-

textural. Thus, as we explained in *Gray*, the establishment of a *prima facie* case is not the equivalent of ultimately proving age discrimination, and the burden remains on the plaintiff throughout the action to persuade the finder of fact that he was indeed discharged because of his age. In other words, while the evidence presented to establish plaintiff's *prima facie* case retains its inherently probative force throughout the ADEA action, it may not necessarily constitute sufficient evidence to carry plaintiff's ultimate burden of proof. *See generally Gray*, 792 F.2d at 251; *Loeb*, 600 F.2d at 1011–12.

■ Finally, applying the above in the context of a summary judgment proceeding, we have explained that "merely making out a *prima facie* case does not automatically save appellant from a summary judgment motion." *Dea v. Look*, 810 F.2d 12, 15 (1st Cir.1987). Thus, in order to avoid summary judgment, an ADEA plaintiff must "indicat[e] what he would prove to show that the defendant['s] explanation was a mere pretext" once the defendant has articulated a legitimate, non-discriminatory reason that rebuts plaintiff's initial showing that a genuine issue exists as to the material fact that the plaintiff was discharged because of age discrimination. *Dea*, 810 F.2d at 16.

Against this legal backdrop, we now turn to an examination of Hebert's case and the District Court's determination of the summary judgment cross-motions in Mohawk's favor.

## THE PRIMA FACIE CASE

■ The District court based its grant of summary judgment to Mohawk in large part on its finding that Hebert had failed to make out a *prima facie* case of age discrimination. There can, of course, be no doubt on this record that Hebert was within the protected class or that he was replaced by someone with qualifications similar to his own, thus demonstrating a continued need for the same services and skills. Hebert was fifty-nine years of age when he left Beebe's employ and was immediately replaced as controller by Jody

Feldman, his twenty-eight year old assistant controller, who continued to function in the role as Hebert had with only "minor modifications." Reeves Depo. 56. Nor can there be any doubt that Hebert produced enough evidence of the fact that he was qualified for his job as controller to survive the motion for summary judgment. Although Mohawk contested Hebert's account of the adequacy of his job performance, Hebert unquestionably adduced a quantum and quality of evidence of his competence as controller sufficient to prevail if a jury believed his version of the facts and disbelieved defendant's. *Stepanischen v. Merchants Despatch Transp. Corp.*, 722 F.2d 922, 929 (1st Cir.1983) ("At the summary judgment stage of litigation, a court should ask itself whether the plaintiff could prevail if a jury or judge believed plaintiff's version of the facts and disbelieved defendant's version."). However, the heart of the District Court's holding that Hebert had failed to establish his *prima facie* case was its finding that, rather than being terminated by the company, Hebert had voluntarily accepted early retirement. In the words of the District Court:

> ... even if it was Mohawk's intention to terminate Hebert, it appears that Hebert voluntarily left when the prospect of early retirement was presented to him. The plan offered to Hebert was not presented as a take-it-or-leave-it proposition. Instead, it was phrased in terms of an offer; indeed, Hebert himself referred to it as an offer in his counter-proposal. At no point, then, was Hebert told to accept the plan or be fired; Dalton stated in his deposition that Hebert could have rejected the retirement plan and stayed on, at least for a while. This is not to say that had Hebert not accepted the plan, he *would not* have been fired; there does appear to have been some enmity between Dalton and Hebert, and Dalton did appear dissatisfied with Hebert's performance. Nevertheless, in point of fact, it does not appear that Hebert was terminated. Instead, he merely accepted what he may have believed to be his fate, and tried—successfully—to strike the best bargain he could with the company....

Additionally, Hebert admits that the working conditions were not changed after the offer was made nor was Hebert's working life changed for the worse after the offer. Thus the classic elements of constructive discharge are notably absent from Hebert's case.

In arriving at its conclusion that Hebert's is a case of voluntary early retirement, the District Court relied, mistakenly we think, on the reasoning of the Sixth Circuit in *Ackerman v. Diamond Shamrock Corp.*, 670 F.2d 66 (1982). In *Ackerman*, the fifty-nine year old plaintiff was informed by his superior that his job was to be eliminated in a corporate reorganization and that his duties were to be divided between two employees who had been reporting to him, one in his late thirties and one in his early fifties. Ackerman's superior then suggested to him that he take early retirement and provided him with a sheaf of papers which, among other things, outlined the terms of the retirement package being offered by the company. Nearly a month later, Ackerman signed the retirement agreement, a signing which he later consistently characterized as being "of his own free will." Nevertheless, at no time before the signing did the company offer Ackerman an alternative to accepting early retirement. In granting summary judgment for the defendant employer, the Sixth Circuit held that, even though Ackerman was given only a choice between accepting early retirement or being fired without benefits, his retirement was voluntary in that he signed the document (which clearly stated that the parties "mutually desire" to make the arrangement) "of his own free will" and accepted the "generous" benefits of the agreement.

■ In our view, to accept the reasoning of the Sixth Circuit that a person's acceptance of an early retirement package is voluntary when faced with a "choice" between the Scylla of forced retirement or the Charybdis of discharge, as the District Court has done in this case, is to turn a blind eye on the "take-it-or-leave-it" nature of such an "offer". As the Seventh Circuit explained in *Henn*, an early retirement is

distinguished from a discharge by the vesting in the employee of a power to choose to keep working and, as we ourselves have explained, to keep working under conditions that are not "so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir.1986) (quoting *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (1st Cir.1977)). Absent the right to decline an employer's offer of early retirement and keep working under lawful conditions, the "decision" to take the early retirement "option" is no decision at all. A "choice" between not working with benefits and not working without benefits amounts to, in effect, compulsory retirement. Further, to accept the Sixth Circuit's view is to ensure that, as district courts that have had occasion to consider this point have explained, "all persons under sixty-five who were entitled to pension benefits could be terminated because of their age and foreclosed from an age discrimination claim if they elected to receive their pension benefits." *Morgart v. Union Mut. Life Ins. Co.*, 644 F.Supp. 934, 936 (D.N.J.1986); *Havelick v. Julius Wile Sons & Co.*, 445 F.Supp. 919, 925 (S.D.N.Y. 1978). Accordingly, we explicitly reject the teaching of *Ackerman* and hold that, absent the option to choose to keep working under lawful conditions, an employer's offer of a choice between early retirement with benefits or discharge without benefits is nothing other than a discharge.

The question in this case thus becomes whether this plaintiff was placed by the events of 1984 in the impossible position of having to choose between discharge and retirement. Although Dalton testified that Hebert's choice when he was approached about taking early retirement was between accepting the offer or continuing to work (Dalton Depo. 44), Reeves, Dalton's confidante in the matter, contradicted Dalton's version, testifying that it was clear when Reeves spoke with Hebert on October 23, 1984 that Hebert had to leave the company. Reeves Depo. 36. Nor does the language and tone of Hebert's October 25, 1984 letter in response to the meeting of October 23d leave any room for doubt that Dalton's intention to see Hebert gone was communicated to and understood by Hebert. More specifically, Hebert referred in his letter to the offer of early retirement as a "request" in quotes, clearly indicating that he knew that the "request" was but a veiled threat to "retire or else . . .". In addition, Hebert described the offer of retirement as "the company . . . forc[ing] me to leave," and bargained for a written statement from the company "stating that I was *asked* to retire," again indicating his knowledge that he had no choice in the matter. Because the proffered evidence, if believed, would prove that Hebert was indeed faced with an impermissible take-it-or-leave-it choice between retirement or discharge, a choice that denied him the power to decline the offer and keep working within the company, we find that Hebert met his burden of production on the discharge element of the *prima facie* case and thus established his *prima facie* case as a whole. The fact that Hebert, when confronted with the retire-or-be-fired choice, bargained for all that he could get in the way of benefits simply does not change the fact that this was, at bottom, a forced retirement, not a voluntary one.

## EVIDENCE OF PRETEXT

Although the District Court held that Hebert had failed to establish a *prima facie* case of age discrimination because he did not show that he had been terminated, it did not rest its decision on this ground alone. In the alternative, the court below also found that Hebert's case failed because, assuming arguendo that he had in fact been discharged, he had not raised a genuine issue of material fact regarding Mohawk's age discriminatory intent in discharging him. Accordingly, we turn next to Mohawk's articulated nondiscriminatory reasons for terminating Hebert and the evidence that Hebert produced to raise a genuine issue that Mohawk's claimed reasons were but a pretext for age discrimination.

To rebut Hebert's claim of age discrimination, defendant advanced two nondis-

criminatory reasons for its actions, Dalton's dissatisfaction with Hebert's job performance and a personality clash between Dalton and Hebert. Having thus lost the benefit of the presumption of discrimination raised by plaintiff's *prima facie* case, Hebert was required to show, unaided by the initial inference, that Mohawk's stated reasons were but a pretext for age discrimination.

We will waste few words on defendant's claim that a personality clash between Dalton and Hebert motivated Hebert's discharge. Given Dalton's own admission that he was "on friendly terms" with plaintiff, we find this allegation frankly implausible. Dalton Depo. 51.

■ In contrast, defendant's assertion that Hebert was discharged for cause is more difficult to prove pretextual. Although Hebert vehemently argued that Mohawk's claim of inadequate job performance is a recent invention seized upon by defendant to deflect plaintiff's ADEA claim, and offered a spate of countervailing evidence documenting his sixteen year history of estimable performance at Beebe, up to and including the period immediately preceding his discharge (Reeves Depo. 23, 40), still the record as a whole clearly shows that, however competent Hebert's performance, Dalton was critical of his work, feeling that his output was unnecessarily voluminous and lacking in analysis. Dalton Depo. 49, 52; Reeves Depo. 31, 35. Although the reasonableness of Dalton's perception of Hebert's competence is certainly probative of whether defendant's assertion of inadequate job performance is a

pretext, we are reminded that in this Circuit Dalton's motivation in firing Hebert, not his business judgment, are at issue in the case. *See, e.g., Menard,* 848 F.2d at 287; *Gray,* 792 F.2d at 256; *Loeb,* 600 F.2d at 1012 n. 6. Accordingly, we must look to see whether Hebert's evidence, when taken as a whole, suggests a countervailing reason for his termination, specifically that he was discharged because of his age.

■ Hebert's principal line of argument derives from a conceptualization of this case as one involving a reduction in force. Relying on the formulation enunciated in *Holt* and reiterated in *Schuler,* Hebert presented statistical evidence tending to show that Hebert's termination was but one in a series of personnel changes at Beebe designed to accomplish a facially neutral reorganization by systematically eliminating older workers from the workforce. More specifically, Hebert documented that, in the first nine months of Dalton's tenure at the helm of IPG, thirteen of the seventeen salaried workers in the protected class were terminated, then breathed life into this statistical data by recounting the experiences of eight of these individuals, including decisions by four of them to prosecute ADEA actions.[11] Although clumsily handled, this data is arresting given defendant's failure, despite a thoughtful critique of the limits of the inferences permissibly made on the strength of such figures, to rebut the bottom line. This Court is thus left with the unchallenged and rather startling fact that at a minimum 76% of Beebe's older employees [12] were let go during the Dalton reorganization.[13]

---

11. While it is undisputed that former Mohawk President Edward McAdam's ADEA action ended in a finding of no discrimination, it is also undisputed that two of the other employees in question were rehired after filing ADEA actions. P. Brief on Appeal 3.

12. The 76% figure assumes, as plaintiff states, that thirteen of seventeen salaried employees over forty-nine years of age were terminated during the relevant time period. Since, however, the protected class begins with age forty, we suspect that plaintiff's data, if accurate, under reports Beebe's rate of termination of older employees.

13. Although defendant makes no effort to rebut plaintiff's claim that a disproportionate number of older employees were terminated during the Dalton reorganization, it does specifically challenge three of the cases cited by Hebert, arguing that they were not age related terminations, and generally challenge all the statistical evidence as inadequate to support an inference of age discrimination. D. Brief on Appeal 24–7. It is true that plaintiff has himself admitted that the discharge of former Mohawk President Edward McAdam was for cause. *See* n. 2 *supra.* Additionally, this Court notes that plaintiff's statistical analysis would be greatly strengthened by the additional data defendant points to, data which would create an even stronger inference

■ Although admittedly weak, at least in raw form at the summary judgment stage of this ADEA action, such statistical evidence is admissible on the issue of pretext in a discrimination case to show a general pattern of discrimination. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 805, 93 S.Ct. 1817, 1825, 36 L.Ed.2d 668 (1973). Nor does Hebert rest his case for pretext on this general pattern data alone. To this he adds several other suggestive scraps of circumstantial evidence, to wit:

1. In April 1984, Dalton and Reeves met at the Tara Motel in Nashua, N.H., to discuss Dalton's plan for the reorganization of Beebe. This conversation focused very specifically on Dalton's plans to get rid of a number of salaried employees, and, after some discussion of jobs that might be eliminated or consolidated, turned to the termination of people. Among the individuals discussed were two of the thirteen salaried workers in the protected class discussed above. Of these two men it was said "the discussion was ... on their years of service and age, and we decided that it was ... to the good of the company that this move be made. And we devised a retirement situation for the two gentlemen." Reeves Depo. 25.

2. Prior to the creation of IPG, Hank Fawcett, the Chair of the Board of Mohawk, commented to then Beebe President Edward McAdam to the effect that "it's time we older guys turned over the daily reins to some other group." McAdam Depo. 185-6.[14]

3. Jody Feldman, the young Mohawk accountant brought in in August 1984 to serve as Hebert's assistant controller, was offered the job in July 1984, fully three months before any discussion had taken place between Hebert

and Dalton or Reeves about the possibility of Hebert taking early retirement, and was led by top management to believe that "I have been hired specifically to replace Mr. Hebert when he steps down.... The actual date of his departure is not yet known, but it could be up to 18 months." Letter of August 6, 1984 from J. Feldman to A. Reeves accepting the position of assistant controller at Beebe Rubber Company.

4. Jody Feldman, according to Reeves's version of events, literally did "replace Mr. Hebert," conducting the work of the controller exactly as Hebert had with only "minor modifications." Reeves Depo. 56. Reeves's perception is corroborated by Hebert, who saw no change in the reports that Feldman supplied to Beebe management. Hebert Depo. 101. It is interesting to contrast this testimony with that of Dalton, who reported improvements in the analysis of what the numbers meant under Feldman "but not a great improvement" in the volume of the financial reports. Dalton Depo. 67.

5. Although claiming to have discharged Hebert for cause, Dalton admitted in deposition testimony that he could not recall ever giving Hebert feedback on his work, a fact corroborated by Reeves, who testified that he had no knowledge of Dalton ever having explained his concerns to Hebert. Dalton Depo. 11; Reeves Depo. 32–3.

■ Admittedly, there is no smoking gun evidence of age discrimination in this case. To be sure, the evidence cited above is circumstantial. However, as federal courts have recognized so often in the past, circumstantial evidence is to be expected in discrimination cases given the complexity of the issues and the difficulty, in this

---

that the terminations in question were for age. Despite its apt criticisms of plaintiff's data, however, defendant has missed the crucial point: Even as plaintiff has not irrefutably established his claim of age discrimination, so too has defendant, who has also not supplied the missing data, successfully refuted it. Instead, both sides have, in disputing each other's claims, raised a justiciable issue of material fact. Neither the District Court nor this Court are empowered to

resolve issues thus joined at the summary judgment stage of a proceeding. Such matters must necessarily proceed to trial.

**14.** We note in this regard our recent comment in *Freeman,* 865 F.2d 1342, that "the battle plan of the admiral is a valid datum in assessing the intentions of the captain of a single ship in the flotilla."

rights conscious era, of producing direct evidence of discrimination. *See, e.g., Freeman*, at 1340; *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir.1987). And how much more vexing are the problems of proof in a case such as this one, where a reduction in force has been undertaken for a legitimate business purpose and efforts to root out a stagnant senior management run the risk of coincidentally resulting in the dismissal of a disproportionate number of older employees. Having said all this, however, the fact remains that this Court can readily conceive of cases in which an employer, faced with a bona fide business crisis, impermissibly determines to avert disaster by acting in a discriminatory way, mistakenly equating age with lack of productivity. While the evidence proffered here does not begin to prove that this is such a case, we think that what plaintiff has shown clearly defeats a motion for summary judgment. In our view, Hebert has succeeded in placing in issue the question of whether, but for a generalized age animus at Beebe, he would not have been discharged and replaced by his young assistant. It is thus Hebert's right to have his case decided by a jury. Accordingly, the decision of the Dist Court is *reversed* and the case is remanded for further proceedings consistent with this opinion.