789 F.Supp. 1468 (1992)
Dorothea G. LASLEY, Plaintiff,
v.
VETERANS ADMINISTRATION, et al., Defendants.
No. S88-0065C.
United States District Court, E.D. Missouri, Southeastern Division.
April 20, 1992.
*1469 Ronald C. Gladney, Bartley, Goffstein, Bollato and Lange, Clayton, Mo., Dale Nunnery, Swindle, Nunnery & Belew, Doniphan, Mo., for plaintiff.
Thomas E. Dittmeier, U.S. Atty. by Eric T. Tolen, Asst., St. Louis, Mo., Lairold M. Street, E.E.O.C., Washington, D.C., for defendants.

*1470 MEMORANDUM OPINION
LIMBAUGH, District Judge.
Plaintiff filed this action alleging that defendant Veterans Administration discriminated against her on the basis of her age. Plaintiff alleges that the Veterans Administration constructively discharged her from her position as Chief of Nursing Services, by coercing her to take early retirement, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 623 (ADEA) and the Administrative Procedure Act of 1946, 5 U.S.C. § 551 et seq. and 5 U.S.C. § 701 et seq., as amended. Plaintiff further alleges that defendants Equal Employment Opportunity Commission (EEOC) and Clarence Thomas, former chairman of the EEOC, violated established policy under 29 C.F.R. § 1613.235(a)(2) in granting defendant Veterans Administration's request to reopen and reconsider its previous ruling in this matter. The case was tried before this Court, in St. Louis, sitting without a jury on September 12, 1991. All objections to exhibits that were taken with the case, are now overruled, and all exhibits offered into evidence at trial are received into evidence. This Court, having now considered the pleadings, the testimony of the witnesses, the depositions testimony, the documents in evidence and the stipulation of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law as required by Federal Rule of Civil Procedure 52.

FINDINGS OF FACT
Plaintiff Dorothea Lasley is a citizen of the United States who resides within the Southeastern Division for the Eastern District of Missouri. Plaintiff Lasley is an "employee" within the meaning of the ADEA. Defendant Veterans Administration (VA) is an executive agency of the United States of America within the meaning of 5 U.S.C. §§ 105 and 701. Defendant EEOC is an executive agency of the United States of America within the meaning of 5 U.S.C. §§ 105 and 701. Defendant Thomas K. Turnage is the Administrator of defendant VA. Defendant Clarence Thomas was the Chairman of the EEOC during all times relevant to this cause of action.
In February 1984, plaintiff transferred to the Poplar Bluff  Missouri Veterans Administration Medical Center (VA Hospital) from a similar facility in Lincoln, Nebraska. She transferred into the same position she had held in Nebraska  Chief of Nursing Services. She had been employed, as a nurse, by the VA for approximately twenty-five (25) years, serving in several different positions. As Chief of Nursing Services, plaintiff supervised the nursing staff including the supervisors of the various nursing units and the floor nurses, planned nursing schedules, and assisted with the hospital budget. Up until the events in question, plaintiff's job performance evaluation ratings had been satisfactory. However, her last three evaluations, right before she transferred to Poplar Bluff and while at the Poplar Bluff VA Hospital, noted plaintiff's rigid and compulsive behavior. Although her efforts to improve the quality of patient care were commendable, the administrative evaluators expressed repeated concerns over her management skills regarding her own staff. Plaintiff's Exhibits 7, 8, and 9. While at Poplar Bluff, her proficiency ratings dropped from the 80s to the middle 60s. Her last two proficiency ratings of 67.5 and 64.5 (out of a possible maximum of 88) are considered to be in the low end of the "satisfactory" range.
In December 1984, plaintiff and one of her subordinates, Evelyn Thorton (Supervisor of the Nursing Home Care Unit) began to have serious "communication" problems. As their professional (and personal) relationship began to deteriorate, they began to forgo the usual "chain of command" regarding policy and procedures, and there were frequent disputes in front of fellow staff members. Attempts by the Chief of Staff, Dr. Don Andrus and the Medical Center Director, Walton Bonner to resolve the problems proved unsuccessful. Finally, Mr. Bonner requested a "special purpose visit" by the agency's Central Office. The site visit was conducted on April 16-18, 1985 and a report was received by Mr. *1471 Bonner on May 20, 1985. The report made certain recommendations for changes in plaintiff's behavior and attitude.
On May 22, 1985 plaintiff was informed that her husband was terminally ill with lung cancer. She requested and was granted annual leave until June 22, 1985 to care for her spouse. On June 22, 1985 she requested and was granted two weeks of sick leave. While on annual leave and sick leave, plaintiff was not only tending to her husband but was also totally responsible for the care of her ailing 92 year old mother. Due to the stress of her situation, plaintiff herself was under the care of a physician for anxiety and depression. Sick leave was again approved pursuant to her physician's statement from July 8, 1985 through August 7, 1985.
In May 1985, Ms. Thorton began receiving harassing phone calls. She contacted the telephone company which, after Ms. Thorton executed an intent to prosecute, placed a tracer on her telephone line. The telephone company traced the calls to plaintiff's residence and so informed Ms. Thorton and the local police. On July 10, 1985 plaintiff was arrested by the police and charged with telephone harassment of Ms. Thorton. Mr. Bonner was informed of the result of the telephone company's tracer and plaintiff's arrest made headlines in the local newspaper. Ms. Thorton had been initially reluctant to prosecute and once the matter became public, she decided to move from Poplar Bluff. The charges against the plaintiff were eventually dropped.
While on leave, plaintiff had no contact with the hospital administrators, nursing staff, or the Acting Chief of Nursing Services (plaintiff's Assistant Chief of Nursing Services). The Acting Chief Nurse not only continued to carry out her own duties but took on the additional responsibilities of Chief Nurse. Mr. Bonner and Dr. Andrus felt that the Acting Chief Nurse was doing a credible job, but that gaps in efficiency were beginning to appear. They believed that the Acting Chief Nurse could adequately function for a short while, but could not continue in that capacity for a long period of time. Dr. Andrus repeatedly tried to contact plaintiff by phone but was unable to do so. A letter sent to plaintiff was ignored. Finally, a meeting was scheduled with plaintiff on July 2, 1985, which plaintiff cancelled. On July 8, Dr. Andrus contacted plaintiff at a hospital in Memphis, Tennessee where plaintiff was caring for her husband following his post-operative treatment for cancer. Dr. Andrus told plaintiff that he needed to meet with her to discuss her future plans. He needed to know when he could expect her back at work. She told him that she was too stressed out to discuss her job or to meet with him. She was unable to give him any indication as to when she might return to her job. On July 15, 1985 a letter was sent to plaintiff formally requesting her to meet with Mr. Bonner and Dr. Andrus. Plaintiff was aware of the fact that the purpose of this meeting was to discuss her future with the hospital.
A meeting was set up for August 1, 1985. Prior to the meeting, Mr. Bonner had contacted Richard Montgomery, Personnel Director of the VA Hospital. Mr. Bonner and Mr. Montgomery discussed Bonner's extreme dissatisfaction with plaintiff's job performance such as her rigidity, inability to take advice from other medical personnel, her hostile attitude, and her recent arrest. Plaintiff's age was never discussed between Bonner and Montgomery as a reason for Bonner's dissatisfaction with plaintiff's job performance. Montgomery had a similar conversation with Dr. Andrus, and again age was never a subject of the discussion as cause for discharge. Bonner asked Montgomery to research retirement options for plaintiff, as well as bringing plaintiff up before the Professional Standards Review Board for termination proceedings. After some researching, Montgomery determined that plaintiff was eligible for immediate disability retirement, or optional early retirement on her 60th birthday in February 1986. Mr. Montgomery relayed this information to both Mr. Bonner and Dr. Andrus. He also informed them as to the procedures for initiating a proficiency review by the Standards Board.
*1472 On August 1st, plaintiff, Mr. Bonner and Dr. Andrus met to discuss plaintiff's future employment. Mr. Bonner and Dr. Andrus told plaintiff of their dissatisfaction with her job performance. They discussed the arrest incident and plaintiff's inability to indicate any anticipated return date. There is a difference of opinion between the participants as to the exact conversation that took place, but they do agree that plaintiff's age never came up in the meeting. Plaintiff was offered three options regarding her future with the hospital: 1) disability retirement; 2) optional early retirement effective February 26, 1986; and 3) termination proceedings before the Standards Board. If plaintiff chose optional early retirement, Bonner offered to place her in another administrative position until her retirement date. Plaintiff was asked to inform the agency of her decision by August 8, 1985. She was also told that electing to take retirement would require the execution of certain documents by her. Although plaintiff cannot recall the particulars of the discussions with Bonner and Andrus, especially with regard to her leave situation, she testified at trial that she felt that "Mr. Bonner was going to retire me" and that she would receive no further leave after August 7th if she did not execute retirement papers. Dr. Andrus' deposition testimony of August 28, 1990 does not indicate any statements by either himself or Mr. Bonner to plaintiff threatening her with termination of leave if she did not sign retirement papers. Mr. Montgomery testified at trial that he never told plaintiff that she had to sign the retirement papers in order to get additional leave. Mr. Bonner's report of the August 1st meeting states "I reminded Mrs. Lasley that she was on approved sick leave through August 7, 1985, and also reminded her that I would expect her response by close of business August 7th." Government's Exhibit H. (Mr. Bonner passed away in August 1990 shortly before his scheduled video deposition.)
On August 5, 1985 Cary Marks, plaintiff's accountant, contacted the Personnel Office of the hospital. Pursuant to plaintiff's request, Mr. Marks inquired about the benefits plaintiff would be entitled to if she elected either disability or optional early retirement. On August 6th, Mr. Marks again contacted the Personnel Office. Mr. Marks testified that he never told anyone that plaintiff had decided to retire or that plaintiff ever told him that she had decided to retire. Mr. Montgomery testified that his office had been contacted by Mr. Marks and that Mr. Marks had indicated that plaintiff had elected to take early retirement. See also, Government Exhibit I.
On August 8, 1985 Mr. Montgomery contacted plaintiff about signing the retirement papers. Plaintiff informed Montgomery that due to her husband's illness, she was unable to leave her home. Arrangements were made for someone from Personnel to bring the required papers to plaintiff's home for her to execute. The necessary documents were drafted and Patricia Richman, Personnel Clerk, went to plaintiff's home to obtain her signature. Plaintiff testified that she did not know that the papers were retirement papers and that Ms. Richman did not explain them to her. She further testified that Ms. Richman told her that unless she signed the retirement papers, she would not get additional leave time. Ms. Richman, however, testified to a different encounter with the plaintiff. She testified that she and the plaintiff sat down at a table and went over the papers. Plaintiff was emotionally distraught but was coherent and asked questions. Although reluctant to sign the papers, plaintiff did indeed sign them. There was no conversation as to the reasons for plaintiff's retirement election, although Ms. Richman testified that plaintiff repeatedly expressed concerns about "they living up to their end of the bargain." Ms. Richman did not inquire as to who "they" were nor did plaintiff tell her. Plaintiff also indicated to Ms. Richman her fear that Dr. Andrus and Mr. Bonner would not approve her additional leave requests if she did not sign the papers. Ms. Richman explained to plaintiff that the papers she was signing simply assured everyone that she intended to take early retirement. Since plaintiff was not taking disability retirement (effective immediately), the optional early retirement *1473 papers had to be signed now because until her retirement was reached her additional leave needed to be approved periodically. It was standard procedure. She further informed plaintiff that although the papers were executed on August 8th, they would be post-dated February 26, 1986 the date of her eligibility for optional early retirement. Plaintiff told Ms. Richman that she did not want survivor benefits. Ms. Richman told plaintiff that if she did not want survivor benefits, Mr. Lasley would have to sign a waiver of benefits. Plaintiff escorted Ms. Richman into a back bedroom where she observed Mr. Lasley fully clothed, sitting upright, and connected to an oxygen tank. Ms. Richman explained the waiver to him, he indicated that he understood, and she witnessed his signature on the waiver. Ms. Richman finished her business, gave the plaintiff a sealed envelope from Dr. Andrus, and left. Upon returning to her office, she relayed the account of her visit to Mr. Montgomery and drafted a report of same. See, Government's Exhibit J.
Although plaintiff testified (and Mr. Montgomery denies) that Mr. Montgomery told her that she had to sign the retirement papers in order to get her leave application approved, the sealed envelope from Dr. Andrus contained the leave application submitted by plaintiff on August 1, 1985 and signed by Dr. Andrus on August 7, 1985 (the day before plaintiff signed her retirement papers). Leave had been approved for plaintiff until November 18, 1985.
On August 9, 1985 Mr. Bonner sent a "TWIXT" to the Central Office. A "TWIXT" is a request from a facility to the VA's Central Office requesting recruitment, in this case, for a Chief of Nursing Services. See, Government's Exhibit K. Shortly thereafter, the VA Hospital received authorization to get a replacement for Mrs. Lasley. The Central Office forwarded the Personnel Office files on several appropriate candidates for the position. These files were reviewed by Mr. Bonner, Dr. Andrus, and other unnamed management people. In late October 1985, Mitch Rigdon, a 34 year old male who was at the VA Hospital in Baltimore, Maryland as the Assistant Chief Nurse, committed to take the job as Chief of Nursing Services. He was expected to arrive to begin his duties in late November.
On November 3, 1985 plaintiff's husband passed away. On November 13, 1985, armed with her physician's statement that she could return to work, plaintiff met with Dr. Andrus and requested that her retirement papers be withdrawn and that she be returned to her old position effective immediately. Dr. Andrus then spoke with Mr. Bonner, who then contacted Mr. Montgomery about whether or not he could deny plaintiff's request. Mr. Montgomery determined that although plaintiff was a Title 38 Veterans Administration employee, a regulation primarily promulgated with regards to Title 5 employees, was equally applicable to her. Mr. Montgomery informed Bonner that pursuant to Regulation 715-1, a agency was entitled to decline a request to withdraw a resignation or an application for retirement when the agency had a valid reason, such as already having made a commitment to another individual for the position in question.
In a letter dated November 13, 1985, Bonner explained to plaintiff that he was denying her request to withdraw her retirement papers because a commitment to hire a replacement had already been made, and to cancel that commitment would be disruptive to the agency and the hospital. He told her that she would remain on approved leave status until the effective date of her optional retirement. See, Government's Exhibit M. By letter dated November 15, 1985 Dr. Andrus informed plaintiff that she could either request additional leave until the effective date of her retirement or she could report to work on November 22, 1985. If plaintiff chose the latter, her work assignment would be determined on that date by himself and Mr. Bonner. She was to inform Dr. Andrus of her decision by November 21, 1985. See, Government's Exhibit N. By letter dated November 20, 1985 plaintiff informed Dr. Andrus that she would return to work on November 22, 1985. On November 22, 1985 plaintiff returned to work and was assigned several administrative tasks, including primarily *1474 the daily review of patients' charts in order to coordinate changes in proscribed treatment. She was restricted to certain areas of the hospital and denied her own telephone, although she had access to other telephones. On November 25, Mitch Rigdon arrived at the VA Hospital to begin his duties as Chief Nurse.
On December 3, 1985 plaintiff approached Bonner with several requests, including the withdrawal of her retirement papers. Once again her request was denied. On December 20, 1985 plaintiff filed a formal EEOC complaint alleging that because of her age, the VA had forced her to take early optional retirement, and then refused to allow her to withdraw the retirement papers. The EEOC Investigator found that age was the determinative factor in plaintiff's constructive discharge. The VA rejected the EEOC Investigator's findings, and concluded that no discrimination had taken place. After the plaintiff requested a decision by the VA without a hearing, the VA issued a final decision finding no discrimination. The plaintiff filed a timely appeal, arguing that the VA's reasons for its actions were pretextual. On October 8, 1987 the EEOC (initially) found that the VA's reasons for its actions were pretextual and that plaintiff's age was the determining factor for its decision to "force" her into early retirement. On November 10, 1987 the VA requested the EEOC to reopen and reconsider its decision of October 8, 1987. The VA contended that the prior decision was based upon an improper interpretation and application of the facts and the law. On February 26, 1988 the EEOC granted the VA's request to reopen, and after another review and analysis of the facts and applicable law, reversed its decision of October 8, 1987. Plaintiff filed this action on April 8, 1988. She seeks reinstatement by the EEOC of its October 8, 1987 decision, reinstatement by the VA to her old position as Chief Nurse at the Poplar Bluff VA Hospital, back pay, and attorneys' fees.

CONCLUSIONS OF LAW

I. AGE DISCRIMINATION
Plaintiff Lasley has brought suit alleging employment discrimination on the basis of her age. The Court has jurisdiction pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621-634 (1985). Plaintiff has satisfied all the procedural prerequisites to suit under the ADEA.
Plaintiff alleges that had it not been for her age, the VA could not have "forced" her to take early optional retirement. The VA contends that plaintiff's age was only a factor which enabled it to offer her early retirement; that the decision not to continue plaintiff's employment was based on her past history of inability to work well with others, the occasion of her arrest, and her refusal to provide the hospital administrators with any anticipated return date.
In order to establish a prima facie case of employment discharge due to age discrimination, a plaintiff must show that a defendant discharged the plaintiff "under circumstances which gave rise to an inference of unlawful discrimination." Johnson v. Minnesota Historical Society, 931 F.2d 1239, 1242-43 (8th Cir.1991); Halsell v. Kimberly-Clark, 683 F.2d 285, 289 (8th Cir.1982), cert. den., 459 U.S. 1205, 103 S.Ct. 1194, 75 L.Ed.2d 438 (1983), citing Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981). Under the ADEA, a plaintiff has a dual and alternative proof approach: direct or indirect methods of proof. Beshears v. Asbill, 930 F.2d 1348, 1353 (8th Cir.1991); Blake v. J.C. Penney, 894 F.2d 274, 278 (8th Cir. 1990). When a plaintiff produces direct evidence, such as statements by decision-makers clearly showing that age was a motivating factor in the employment decision, the burden-shifting standards established by Price-Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), come into play. Beshears, at 1353. In the absence of direct evidence, the guidelines set forth in McDonnell-Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) are applicable. Johnson, at 1242; Halsell, at 289.
In the present case, plaintiff has not provided the Court with any direct evidence *1475 of age discrimination. She admits that her age was never discussed, at any time, with Dr. Andrus or Mr. Bonner. She cannot attribute a single statement to either Andrus or Bonner which reflects a discriminatory attitude. Instead, she takes the position that the offer of early retirement is direct proof of age discrimination.
Several courts have reviewed cases involving the offer of early retirement to an ADEA plaintiff and have concluded that such an offer by the defendant employer does not, in and of itself, constitute direct evidence establishing a prima facie case of age discrimination. Hebert v. Mohawk Rubber Co., 872 F.2d 1104 (1st Cir.1989); Henn v. National Geographic Society, 819 F.2d 824 (7th Cir.1987), cert. den., 484 U.S. 964, 108 S.Ct. 454, 98 L.Ed.2d 394 (1988); Duke v. Uniroyal, Inc., 719 F.Supp. 428 (E.D.N.C.1989). In Tribble v. Westinghouse Electric Corp., 669 F.2d 1193 (8th Cir.1983), an ADEA plaintiff brought suit alleging that he had been constructively discharged in violation of the ADEA because his employer had forced him to take early retirement (or else be fired). The appellate court did not directly address the issue of whether or not the offer of early retirement was direct evidence of age discrimination. Rather, the Court, analyzed the case as to whether the plaintiff had made out a prima facie case under the McDonnell-Douglas guidelines. Tribble, at 1196. The Court's approach in Tribble implies that this Circuit also adopts the majority view that an ADEA plaintiff cannot make out a prima facie case of age discrimination merely by showing that an offer of early retirement was made.
The question then becomes whether plaintiff Lasley has made out a prima facie case under the guidelines of McDonnell-Douglas. If she has, the burden shifts to the defendant employer to rebut the inference of age discrimination by articulating legitimate nondiscriminatory reasons for the actions it took. If the defendant employer succeeds in its rebuttal, the plaintiff must overcome the defendant's rebuttal by showing that the reasons offered are pretextual. Throughout this process, the burden of proof shifts, but the burden of persuasion always remains with the plaintiff. The ultimate question to be determined by this Court is whether the defendant employer intentionally discriminated against plaintiff based on her age. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481-82, 75 L.Ed.2d 403 (1983); Johnson, at 1242; Morgan v. Arkansas Gazette, 897 F.2d 945, 949 (8th Cir.1990); Tate v. Weyerhaeuser, 723 F.2d 598, 603 (8th Cir.1983). Consequently, plaintiff Lasley must prove that age, although it need not be the sole factor, was the determining factor in the actions taken by the defendant employer. In the present case, wherein plaintiff Lasley is arguing that she was fired by being forced into early retirement, she must prove to this Court, that the offer of early retirement was nothing more than a "sham" to hide the true discriminatory reasons for her discharge. See, Hebert v. Mohawk Rubber Co., at 1111.
In order to establish a prima facie case of discrimination under the ADEA, plaintiff must establish that 1) she is within the protected age group; 2) that she was doing her job in a satisfactory manner; 3) that she was discharged; and 4) that she was replaced by a younger person. Tolan v. Levi Strauss, 867 F.2d 467 (8th Cir. 1989); Merrick v. Northern Gas Co., Div. of Enron Corp., 911 F.2d 426 (10th Cir. 1990). It is undisputed that plaintiff falls within the age provisions of the ADEA. The evidence shows that although plaintiff's last three performance evaluations showed areas of concern, she did still receive ratings in the low range for satisfactory work. It is also undisputed that the VA filled her position with someone younger. The only element under McDonnell-Douglas in dispute is whether plaintiff was in fact discharged.
Plaintiff contends that she was constructively discharged because she felt that at the August 1st meeting with Andrus and Bonner, they made it clear to her that they did not want her in their employ and that if she did not take retirement, they would force her out anyway. Plaintiff's *1476 own subjective beliefs as to her employer's intentions is not enough to establish constructive discharge. See, Duke v. Uniroyal, Inc., at 431. However, plaintiff is correct in her observation that Andrus and Bonner did clearly indicate that plaintiff's services were no longer wanted. They unequivocably gave her a choice between retirement or facing termination proceedings. However, this choice does not establish that age was a determining factor in the employment decision, only that under the circumstances, this Court views plaintiff's early retirement as a constructive discharge. Thus, plaintiff has made out a prima facie case of age discrimination.
The VA asserts that it offered plaintiff retirement or facing termination proceedings because of her arrest, her job performance deterioration, and her inability to return to work on a date certain. Plaintiff counters that the reasons are pretextual because the harassment charges against her were "bogus" and eventually dropped, her work for over twenty-five years had been satisfactory and the overall nursing staff's work did not suffer during her absence, and she always intended to return to work.
Plaintiff's arrest for harassing Ms. Thorton did occur and did make the headlines in the local newspaper. There was sufficient evidence produced from the phone tap to provide the police with probable cause to arrest plaintiff. The charges were eventually dropped, not because of insufficient evidence, but because Ms. Thorton was upset by the notoriety of the incident and moved away. Plaintiff's arrest was hardly "bogus" and coupled with increasing concerns over plaintiff's management style, it was reasonable to expect Bonner and Andrus to question plaintiff's ability to continue functioning as Chief Nurse.
Although plaintiff's evaluation reports consistently found her work to be satisfactory, they do indicate concerns over plaintiff's inability to deal effectively with her subordinates. In her 1983-84 evaluation report, her supervisor in Lincoln, Nebraska noted that plaintiff's work continued to be satisfactory and that "[t]here has been an improvement in her previous behavior of being too compulsive and pragmatic at times." However, upon her transfer to Poplar Bluff, plaintiff's personnel skills proved to be a source of intense conflict with a key subordinate. This conflict became so severe as to warrant the intervention of the Central Office. In her next evaluation report, Dr. Andrus noted that "[h]er working relationship with management is quite rigid. Her communication to her service has produced some stress to the morale of the Nursing Service." In her 1984-85 evaluation report, Dr. Andrus notes that plaintiff's working relationship with management remained very rigid. He references the on-site visit by the Central Office which was "necessitated by Mrs. Lasley's inability to cope successfully with supervising the NHCU." Finally, he notes that personal problems have caused extended usage of annual and sick leave by plaintiff, and that as of the date of the report (7-19-85) "management is unable to project Mrs. Lasley's future in the VA Nursing Service."
Plaintiff was absent from her job for a considerable amount of time. She concedes that she had virtually no contact with management or the nursing staff during her leave period. However, she believes that her absence and lack of communication did not have a detrimental effect on the overall performance of the nursing service. Assuming arguendo that this observation is true, this still does not render pretextual the VA's concern about the long-range overall performance of its nursing service. It is a credit to the Assistant Chief of Nursing Services' abilities to carry out the responsibilities and duties of both positions, but it does not serve to negate the VA's legitimate concern over the lack of a permanent functioning Chief of Nursing Services. It is neither reasonable nor feasible for the VA to expect the Assistant Chief Nurse to competently carry out the two jobs indefinitely, especially in light of the fact that plaintiff had made no effort to contact her or management to provide advice, and that plaintiff was unable or unwilling to provide management with an anticipated return date.
*1477 Finally, plaintiff believes that she was coerced into agreeing to early retirement because if she didn't her leaves would not be extended. The evidence shows that up until the August 1st meeting, plaintiff was allowed leavetime every time she requested it. After the August 1st meeting, plaintiff's leavetime was consistently extended upon request. The only "condition" placed upon her acceptance of early retirement, was that if she chose not to take retirement, termination proceedings would be initiated.
Plaintiff was under a great deal of emotional stress during this time period. At trial, her recollection of events was vague and at times, somewhat confusing. On the other hand, other people with personal knowledge of the events in question, clearly testified that at no time was plaintiff threatened or given the choice of signing the retirement papers or no leavetime. Plaintiff was given a week to decide whether or not to accept early retirement. During this period of decision, her accountant contacted the VA Hospital to inquire about retirement benefits. She was provided the opportunity to sign the papers in the comfort of her own home. She asked questions and understood the answers. While it is true that she was visibly upset by the prospect of retiring, she was not so distraught as to not be able to discuss the contents and effect of the retirement papers with Ms. Richman.
Plaintiff has failed to prove to this Court, either directly or indirectly, that her age was the determining factor in the VA's decision to constructively discharge her. The offer of retirement was simply a way to allow plaintiff to leave her job with some degree of dignity. Although plaintiff may have been placed in a dilemma, she still has failed to show that the VA Hospital management was motivated by her age.
The Court further finds that the refusal to allow plaintiff to withdraw her retirement application was not motivated by age discrimination. The record shows that the VA Hospital had already contacted the Central Office and begun the replacement process, when plaintiff decided to change her mind. As of October 30, 1985, the position of Chief Nurse had been formally committed to Mitch Rigdon. A TRX from the Central Office to Baltimore, Md. and an Intra-Agency Transfer Request, both dated October 30, 1985, clearly show that Mitch Rigdon had been offered the position and had accepted the position. Government's Exhibits Z1 and Z2. Although Mrs. Lasley professes that she communicated a change of mind to management before October 30th, there is absolutely no evidence to support this contention. The trial testimony and exhibits show that Mrs. Lasley made two requests to withdraw her retirement papers; a verbal request to Dr. Andrus on November 13, 1985 and a formal written request, dated December 9, 1985. Her own Pre-Trial Proposed Findings of Fact and Conclusions of Law list only these two requests to withdraw her retirement papers.
The requests to withdraw were denied because her position had already been committed to another individual. Management supported its rejection on the basis of FPM Bulletin 715-1. They believed that FPM Bulletin 715-1 allowed the VA Hospital to decline a request to withdraw an application for retirement if it has a valid reason, such as a commitment to another individual for the retiree's position. Plaintiff contends that this was a pretext because FPM Bulletin 715-1 does not apply to her. After reviewing the trial testimony, exhibits, and the parties' briefs, the Court concludes that the application of FPM Bulletin 715-1 to plaintiff was not inappropriate. Furthermore, even if the regulation was not applicable to plaintiff, she has failed to show that its usage was a "sham" to cover up management's discriminatory intent. She concedes that management checked with officials in Washington, D.C. and in good faith relied upon their assertion that FPM Bulletin 715-1 was applicable to plaintiff. Moreover, she has still failed to establish that her age was the determining factor in the decision to not allow her to rescind her retirement election. See, Baumgardner v. Inco Alloys International, Inc., 746 F.Supp. 623, 625 (S.D.W.Va.1990).
*1478 It is clear that on August 1, 1985 the VA Hospital management indicated to plaintiff that she had two choices: retirement or face termination proceedings. Perhaps management could have waited longer for plaintiff's personal situation to improve; perhaps they could have been more tolerant of her emotional state. However, it is not the duty of this Court to pass moral judgment upon the business decisions of the VA Hospital management. The ultimate decision to be made is whether plaintiff has persuaded this Court, by a preponderance of the evidence, that age was the determining factor in the VA Hospital's decision to "constructively discharge" her. The plaintiff has failed to carry this burden. The VA Hospital's reasons for offering plaintiff retirement or initiation of termination proceedings were not pretextual and were not due to discrimination based upon plaintiff's age.

II. THE EEOC'S RECONSIDERATION OF ITS OCTOBER 8, 1987 DECISION
The plaintiff contends that the EEOC exceeded its authority when it reopened and reconsidered its prior ruling of October 8, 1987 (which found that the VA had discriminated against plaintiff on the basis of age). She contends that there was no erroneous interpretation of law or regulation or misapplication of established policy in the first place, and that the evidence adduced at trial still provides no basis for the EEOC's decision to reopen and reconsider its prior ruling. The VA contends that the decision to reopen and reconsider was proper under 29 C.F.R. § 1613.235(a)(2) and that the evidence adduced at trial clearly supports the EEOC's decision to reopen and reconsider its ruling of October 8, 1987.
Plaintiff filed a timely administrative complaint with the VA alleging that the VA Hospital had discriminatorily discharged her on the basis of her age. On November 8, 1986 the VA concluded that the Hospital had not discharged plaintiff on the basis of her age. Plaintiff appealed the VA's decision to the EEOC's Office of Review and Appeal (ORA) in accordance with 29 C.F.R. § 1613.233. On October 8, 1987 the EEOC found that the VA Hospital had violated the ADEA in its retirement of plaintiff. On November 10, 1987 the VA petitioned the EEOC to reopen and reconsider its ruling of October 8, 1987. The VA's request was in accordance with 29 C.F.R. § 1613.235(a)(2) which states:
(a) The Commissioners may, in their discretion, reopen and reconsider any previous decision when the party requesting reopening submits written argument or evidence which tends to establish that:
(2) The previous decision involves an erroneous interpretation of law or regulation or misapplication of established policy....
On February 26, 1988 the EEOC granted the VA's request to reopen and reconsider. The EEOC reversed its decision of October 8, 1987 on the basis that its earlier decision involved an erroneous interpretation of law or regulation or misapplication of established policy pursuant to 29 C.F.R. § 1613.235(a)(2). The EEOC concluded that the VA Hospital did not discriminate against the plaintiff on the basis of her age when it constructively discharged her and refused her request to withdraw her retirement application.
The Court has reviewed the plaintiff's and the VA Hospital's pleadings before the ORA, the EEOC's October 8, 1987 decision, the VA's request to reopen and reconsider and responsive pleadings, the EEOC's February 26, 1988 decision, and all the evidence adduced at the trial before this Court. The Court finds that the EEOC's October 8, 1987 decision is replete with factual and legal error. Its factual findings are wholly unsupported by the evidence before it and its legal conclusions contradict established caselaw pertaining to the ADEA. The EEOC Investigator (regarding the October 8th decision) made broad conclusions regarding plaintiff's age as a motive for offering her retirement without any factual support. The Investigator, as well as the EEOC, reasoned that since the VA Hospital did not want plaintiff back and since they could only offer her retirement because of her age, this conclusively established that plaintiff had been *1479 constructively discharged in violation of the ADEA. This is an erroneous interpretation of the law.
The Court agrees with the review and analysis of the EEOC in its February 26, 1988 decision. Nowhere in the October 8th decision are there any factual findings that plaintiff's age played any part in the VA Hospital's actions. Plaintiff's age only came into play as a basis for offering her early retirement as one of three options. As stated before, the mere offer of early retirement does not establish a prima facie case of age discrimination. Moreover, the evidence adduced at trial supports the EEOC's decision to reopen, reconsider, and reverse its October 8, 1987 decision. The October 8, 1987 decision reflects a moral judgment that the VA improperly terminated plaintiff given her emotionally distressful situation. Such a decision cannot extend legal liability upon the VA. The EEOC recognized the mistake it had made and properly corrected it.
This Court agrees with the EEOC that its October 8, 1987 decision was based on an erroneous interpretation of law or regulation or misapplication of established policy. The EEOC did not abuse its authority, pursuant to 29 C.F.R. § 1613.235(b)(2), when it granted the VA's request to reopen and reconsider its prior decision.
For the foregoing reasons, the Court enters judgment in favor of the defendants Veterans Administration, the EEOC, Thomas Turnage, and Clarence Thomas; and against plaintiff Lasley on the merits of plaintiff's complaint.